# MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



**FILED**

Jun 11 2018, 6:00 am

**CLERK**
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Jennie Scott
Muncie, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

Robert J. Henke
Abigail R. Recker
Deputy Attorneys General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

In the Matter of the Termination of the Parent-Child Relationship of J.S., Mother, and P.S. and A.S., Children,

J.S.,

*Appellant-Respondent,*

v.

Indiana Department of Child Services,

*Appellee-Petitioner.*

June 11, 2018

Court of Appeals Case No.
18A-JT-74

Appeal from the
Delaware Circuit Court

The Honorable
Kimberly S. Dowling, Judge
The Honorable
Amanda L. Yonally, Magistrate

Trial Court Cause Nos.
18C02-1608-JT-28
18C02-1608-JT-29

**Kirsch, Judge.**

[1] J.S. ("Mother") appeals the juvenile court's order terminating her parental rights to her minor children, P.S. and A.S. ("Children"). Mother raises three issues on appeal, which we consolidate and restate as:

I. Whether Mother did not receive proper notice of the fact-finding hearing, as she claims, and that as a result, her due process rights were violated; and

II. Whether the juvenile court's judgment terminating her parental rights to Children was clearly erroneous.

[2] We affirm.

## Facts and Procedural History[1]

[3] Mother and Jo.S. ("Father")[2] (together, "Parents") are the parents of P.S., born on August 25, 2011, and A.S., born on December 9, 2013. On March 12, 2015, the Indiana Department of Child Services ("DCS") received a report alleging that P.S., who was three years old at the time, had been brought to Riley Children's Hospital in Indianapolis, Indiana with "six to eight lateral bruises across her back." *Tr. Vol. 2* at 75-76. Parents indicated that P.S.'s behavior was

---

[1] We note that Mother's statement of facts does not follow Indiana Appellate Rule 46(A)(6), which states, "This statement shall describe the facts relevant to the issues presented for review but need not repeat what is in the statement of the case." In Mother's brief, the statement of facts repeats verbatim what appears in the statement of the case and does not present any substantive facts relevant to the issues on appeal. *See Appellant's Br.* at 6-9. We remind Mother's attorney to follow the Appellate Rules.

[2] Father's parental rights were also terminated in the same proceedings as Mother's. However, Father does not participate in this appeal. Accordingly, we will limit our recitation of the facts and our analysis primarily to that which is pertinent to Mother.

out of control so Father "lost control and beat her with a belt." *Id.* at 76. Mother admitted that, while she did not did directly witness Father hit P.S., she heard it from the other room. *Id.* at 77. DCS family case manager ("FCM") Mark Johnson ("FCM Johnson") went to Parents' home that night to assess its condition and found that the home was "marginal in terms of cleanliness." *Id.* at 79. The home had a lot of safety hazards for young children, including huge stacks of dirty clothing, food scattered throughout, and open alcohol bottles, cigarette butts, and ashtrays on the floor. *Id.* Parents requested help in dealing with P.S., so DCS initiated an informal adjustment ("IA"). A safety plan was created, and Parents agreed not to use any physical discipline with Children.

[4] During the IA, FCM Johnson visited the home several more times between March and May 2015. On March 15, the condition of the home was improving. However, on March 17, Mother called FCM Johnson "frantically" after Children had escaped from the house and almost made it to the main road before she caught them; FCM Johnson went to the home to discuss ways to secure it and noticed that the conditions of the home had declined a bit. *Id.* at 80. On March 19, Mother indicated she was sleeping a lot throughout the day and Father was also taking naps, so that is when P.S. was getting out of the house; Mother also indicated that P.S. got Mother's medication out from a locked box and flushed it down the toilet. *Id.* at 81. On March 26, when FCM Johnson arrived, A.S. was in a child corral, and Parents were throwing Cheerios on the floor for A.S. to eat, so FCM Johnson discussed hygiene with Mother; A.S. also had a small bruise on her forehead that FCM Johnson

determined was "somewhat typical" for a child her age. *Id*. at 81-82. On April 7, during a visit by FCM Mary Greene ("FCM Greene"), who had taken over the case, Father was sleeping upstairs and would not go downstairs to meet FCM Greene, so arrangements were made for DCS to return to the home, but no one was home when DCS returned. *Id*. at 82. On April 9, Parents were not cooperative and started to express a reluctance to participate in the IA. *Id*. at 82-83. On May 13, FCM Johnson went to the home and found Mother asleep on the couch, Father asleep upstairs, and a family friend watching Children and picking up the apartment. *Id*. at 83.

[5] During the IA, DCS had services in place to assist the family. P.S. was referred to home-based casework at Meridian Services, and A.S. was referred to First Steps. *Id*. at 106. Around the beginning of May 2015, the family began missing more appointments, and the provider from Meridian Services was concerned about Mother's aggression towards her. *Id*. at 107. At times, when FCM Greene would go to the home, Parents would not be there for their scheduled appointments, and at other times, Mother would not allow FCM Greene to see the Children and would block the doorway. *Id*. Occasionally, Mother would not answer the door, instead, texting FCM Greene from the other side of the door. *Id*. In May 2015, DCS filed its petition alleging Children were children in need of services ("CHINS"), but Children still remained in Parents' care.

[6] On July 10, 2015, FCM Greene and FCM Johnson went to the home after receiving new allegations concerning Parents. At that time, Mother admitted that she and Father had used methamphetamine a few nights before, but she

refused to take a drug screen. *Id*. at 84. On July 20, FCM Johnson and FCM Greene returned to the home and the conditions of the home were poor, including: disassembled electronic equipment throughout the apartment; food on the floor; cigarette butts on the floor; full ashtrays; and liquor bottles on the floor within access of Children. *Id*. at 84-85. Children appeared very dirty, and A.S. had an injury on her head. *Id*. at 85-86. Mother told the FCMs that P.S. had pushed A.S. off of a chair, and A.S. had fallen and hit her head on the door knob in the bathroom, so Mother was planning to take A.S. to the doctor. *Id*. at 85-86. Father admitted that he and Mother had used methamphetamine within the prior few days, but both refused to submit to drug screens. *Id*. at 86. At that time, Children were removed from Parents' care and placed in foster care. *Id*. at 87.

[7] On August 14, 2015, fact-finding hearing was held, and on September 28, the juvenile court entered its order adjudicating Children as CHINS and finding: Parents used methamphetamine; Parents used marijuana almost daily, including at times when they are responsible for the care of Children; Mother did odd jobs in exchange for marijuana; neither Parent was employed; the home conditions were regularly unsafe and unsanitary for Children in that there were large piles of laundry, general clutter, old food on the counters, liquor bottles and medication accessible to Children, overflowing ashtrays and cigarette butts on the floors. *DCS Ex*. 4. Parents were referred to services at Centerstone, including home-based therapy, home-based casework, and random drug screens. *Tr. Vol. 2* at 109-11.

[8] On September 21, 2015, the juvenile court held a dispositional hearing and, on October 20, entered its dispositional decree ordering Mother to participate in services, including in pertinent part: a substance abuse assessment and all recommended treatment; random drug screens; a psychological evaluation and all recommended services; home-based counseling; supervised visitation; and meeting with psychiatric/medical personnel as necessary. *DCS Ex*. 5. Mother was referred to a clinical assessment due to concerns that she may have some mental health issues, home-based therapy to address her substance abuse issues, and home-based case management to help with organization, parenting skills, and keeping the home more organized and clean. *Tr. Vol. 2* at 112-113.

[9] Between August and December 2015, Mother participated in services. However, Mother would sometimes refuse to submit drug screens and would only submit "about half the time." *Id*. at 111, 113. Many of the drug screens she did submit to were positive for THC, including screens on the following dates in 2015: July 17; July 27; September 18; October 26; November 5; and December 17. *DCS Ex*. 13. Since Mother was not consistently submitting to screens, FCM Greene did not believe that she was getting an accurate picture of Mother's drug use. *Tr. Vol. 2* at 113.

[10] In September 2015, Mother was referred to Bethany Henderson ("Henderson"), a mental health therapist at Centerstone. During her intake assessment with Henderson, Mother reported a lot of emotional distress and that she was "occasionally seeing things, hearing things, auditory and visual hallucinations." *Id*. at 140. Mother also reported that she had used a variety of substances in the

past, and that most recently she was mainly using marijuana and would occasionally use cocaine or methamphetamine. *Id.* at 143. Henderson recommended that Mother participate in individual therapy, family therapy, home-based case management, and life skills training. *Id.* at 140.

[11] Mother's treatment goals included closing out the CHINS case, eliminating substance use, improving relationships and positive supports, and complying with court-ordered services. *Id.* at 140-41. Although Henderson hoped to meet with Mother on a weekly basis, between September and December 2015, Mother attended only six individual therapy sessions and three family therapy sessions. *Id.* at 141. Mother failed to show up or cancelled several sessions, and she was difficult to contact in order to schedule appointments. *Id.* at 142. During one of her family therapy sessions, Mother retrieved what appeared to be a glass pipe out of her truck and asked Henderson if she could smoke marijuana. *Id.* at 146. During these therapy sessions, the only progress Mother made was "using coping skills to reduce emotional distress," but made no progress in terms of her sobriety. *Id.* at 142-43. Mother was also referred to Meridian Services for supervised visitation with Children, but she was not able to get along with the service provider, so the referral switched to the Children's Bureau after about six weeks. *Id.* at 117. Mother attended every visit and let the provider know ahead of time if she was unable to attend. *Id.*

[12] On December 22, 2015, the juvenile court issued an order suspending supervised visitation and prohibiting contact between Parents and Children because Parents were making direct and indirect threats against the life and

physical well-being of the FCM and her children and because the Centerstone service provider indicated an unwillingness to continue services in the current environment. *DCS Ex*. 7. The juvenile court also ordered that all services be suspended except for the referral for a psychological evaluation. *Id*.

[13] On dates in February and March 2016, Mother completed a psychological evaluation with Dr. Crystal Hicks ("Dr. Hicks") at Anchor Behavioral Counseling. Mother was diagnosed with bi-polar disorder, accompanied by "psychotic features"; borderline personality disorder; cannabis use disorder; and stimulant use disorder. *Tr. Vol. 2* at 66. During the assessment, Mother presented with a strong belief in corporal punishment. *Id*. Based on Mother's "emotional presentation [and] her strong propensity for substance abuse and the way she presented," Dr. Hicks felt like Mother "was not really in the mental and emotional . . . place to be able to parent her children." *Id*. at 66-67. Dr. Hicks recommended that Mother participate in counseling, parenting training, and substance abuse treatment, and that she be reassessed consistently to ensure she was complying and making progress, in order to be allowed to have visitation with Children. *Id*. at 67.

[14] In May 2016, DCS asked the juvenile court to reinstate services and visitation, and to be allowed to refer Mother to the services that were referenced in Dr. Hicks's report. *Id*. at 115. The juvenile court ordered that services could be reinstated but declined to reinstate visitation. *Id*. at 118. Mother was then referred to office-based therapy, office-based case management, and random drug screens. *Id*. at 116, 120. Mother participated in services for approximately

two weeks, and then she began failing to show for therapy and drug screens. *Id.* at 120, 125. Mother attended one therapy session with Henderson, and then cancelled the next appointment. *Id.* at 141, 144. Henderson tried to contact Mother on five separate occasions to schedule appointments, but she never heard from Mother. *Id.* at 144. On June 21, 2016, Mother tested positive for amphetamine, methamphetamine, and ephedrine. *DCS Ex.* 13.

[15] FCM Greene continued to reach out to Mother in an attempt to get her re-engaged in services. *Tr. Vol. 2* at 125. FCM Greene also sent letters to Mother when she was incarcerated in the Madison County Jail in July and August 2016. *Id.* at 126. Mother told FCM Greene that she had begun services at Meridian Services in the beginning of 2017, but FCM Greene was unable to verify this. *Id.* at 120-21. In January 2017, Mother was referred to Redwood for drug screens. *Id.* at 121. When Redwood contacted Mother regarding the drug screens, Mother texted Redwood back and told them that if they ever come back again, she was going to ask for a no contact order. *Id.*

[16] On August 18, 2016, DCS filed its petitions to terminate Mother's parental rights to Children. On August 23, 2017, DCS sent notice of the termination hearing, which was set for November 9, 2017. On September 5, 2017, Mother pleaded guilty to Level 6 felony possession of chemical reagents/precursors with intent to manufacture and was sentenced to 365 days with 132 days executed and 233 days suspended to probation. *DCS Ex.* 11. The termination hearing was held on November 9, and Mother failed to appear. At the time of the termination hearing, Children had been living in a pre-adoptive foster home

since May 2016. *Tr. Vol. 2* at 123-24. Children had not seen Parents since December 2015. *Id.* at 118. At the conclusion of the hearing, the juvenile court issued its order terminating Mother's parental rights to Children. Mother now appeals.

# Discussion and Decision

## I. Notice

[17] Mother argues that DCS did not comply with the notice provision required when terminating parental rights, and she was denied her right to due process. Pursuant to Indiana Code section 31-35-2-6.5, DCS is required to send notice of the termination hearing to the parents at least ten days before the date of the hearing. Ind. Code § 31-35-2-6.5(b), (c). Indiana Code section 31-35-2-6.5 does not require compliance with Indiana Trial Rule 4, which governs service of process and incorporates a jurisdictional component. *In re H.K.*, 971 N.E.2d 100, 103 (Ind. Ct. App. 2012). Instead, in order to comply with the statute, "one need only meet the requirements of Indiana Trial Rule 5, which governs service of subsequent papers and pleadings in action." *In re C.C.*, 788 N.E.2d 847, 851 (Ind. Ct. App. 2003), *trans. denied*. Indiana Trial Rule 5 states, "[s]ervice upon the attorney or party shall be made by delivering or mailing a copy of the papers to the last known address." Ind. Trial Rule 5(B); *In re B.J.*, 879 N.E.2d 7, 15 (Ind. Ct. App. 2008), *trans. denied*.

[18] Mother contends that DCS failed to properly send her the required notice of the termination hearing. Mother was incarcerated in the Madison County jail at

the time notice of the hearing was sent, and she asserts that DCS should have sent her notice to the jail and not her residence because she had notified DCS that she was in jail. Mother, therefore, claims that she did not receive notice of the termination hearing and was not given an opportunity to be heard at the hearing, which violated her right to due process.

[19] On August 23, 2017, more than ten days before the termination hearing was scheduled to occur, DCS sent Mother notice of the hearing to her last known address. *Appellant's App. Vol. 2* at 74-75.[3] The notice informed Mother that the hearing on the petition to terminate her parental rights to Children would be held on November 9, 2017 at 9:00 a.m. in Delaware Circuit Court 2. *Id.* The notice was mailed to Mother at 5109 North Broadway Avenue, Muncie, Indiana 47303, which was the address that Mother had provided at a January 23, 2017 status hearing as being her current residence. *Tr. Vol. 2* at 21, 39-40.

[20] Mother argues that she was incarcerated at the Madison County Jail on August 23, 2017, and therefore, the notice sent to her last known address in Muncie was not proper. She contends that she had notified DCS of the fact that she was incarcerated, and the notice should have been sent to her in jail. However, there is no evidence in the record that DCS had knowledge that Mother was incarcerated. The evidence in the record shows that FCM Greene knew Mother was incarcerated in July and August 2016 and that Mother's counsel

---

[3] We note that Volume 2 and Volume 3 of the Appellant's Appendix are substantially similar, so all of the Appendix citations will be to Volume 2.

knew Mother was incarcerated until September 12, 2017. *Id.* at 56, 126. At the termination hearing, FCM Greene stated that she had received a letter from Mother that she had responded to in August, but had otherwise not had contact with Mother since a hearing held in July 2017.[4] *Id.* at 56. The evidence, therefore, showed that Mother failed to maintain contact with and keep FCM Greene and DCS updated of her address, and DCS complied with Indiana Code section 31-35-2-6.5 by sending notice of the hearing to her last known address.

[21] Further, Mother's due process rights were not violated due to the fact that she was not present at the termination hearing. Due process has never been defined, but the phrase embodies a requirement of fundamental fairness. *In re D.P.*, 27 N.E.3d 1162, 1166 (Ind. Ct. App. 2015) (citing *In re C.G.,* 954 N.E.2d 910, 917 (Ind. 2011)) (quotations omitted). The United States Supreme Court has stated, "'[T]he fundamental requirement of due process is the opportunity to be heard at a meaningful time and in a meaningful manner.'" *Id.* (quoting *Mathews v. Eldridge,* 424 U.S. 319, 333 (1976)). The process due in a termination of parental rights proceeding turns on the balancing of three factors: (1) the private interests affected by the proceeding; (2) the risk of error created by the State's chosen procedure; and (3) the countervailing governmental

---

[4] The evidence also showed that Mother's attorney also was not aware of her whereabouts at the time of the hearing. When the attorney was asked at the termination hearing if she had been in contact with Mother, she responded that she had called several phone numbers for Mother that had been given to her by DCS and left messages. *Tr. Vol. 2* at 56. The attorney also stated that she had checked the Madison County Jail and discovered that Mother had been released on September 12, 2017. *Id.*

interest supporting use of the challenged procedure. *Id*. Both the State and Parents have substantial interests affected by the proceeding, so we focus on the risk of error created by DCS's actions and the juvenile court's actions.

[22] The risk of error created by Mother's absence from the termination hearing was minimal. Mother was represented by appointed counsel who was present at the hearing, and during the hearing, counsel was able to cross-examine the witnesses presented by DCS and had the opportunity to present evidence. A parent does not have an absolute constitutional right to be present at a termination hearing. *In re K.W.*, 12 N.E.3d 241, 248-49 (Ind. 2014). Mother's due process rights were not violated.

## II. Sufficient Evidence

[23] As our Supreme Court has observed, "Decisions to terminate parental rights are among the most difficult our trial courts are called upon to make. They are also among the most fact-sensitive—so we review them with great deference to the trial courts[.]" *E.M. v. Ind. Dep't of Child Servs.*, 4 N.E.3d 636, 640 (Ind. 2014). While the Fourteenth Amendment to the United States Constitution protects the traditional right of a parent to establish a home and raise his child, and thus parental rights are of a constitutional dimension, the law allows for the termination of those rights when a parent is unable or unwilling to meet his responsibility as a parent. *Bester v. Lake Cnty. Office of Family & Children,* 839 N.E.2d 143, 145 (Ind. 2005); *In re T.F.,* 743 N.E.2d 766, 773 (Ind. Ct. App. 2001), *trans. denied.* That is, parental rights are not absolute and must be

subordinated to the child's interests in determining the appropriate disposition of a petition to terminate the parent-child relationship. *In re J.C.*, 994 N.E.2d 278, 283 (Ind. Ct. App. 2013). The purpose of terminating parental rights is not to punish the parent but to protect the child. *In re T.F.*, 743 N.E.2d at 773. Termination of parental rights is proper where the child's emotional and physical development is threatened. *Id*. The juvenile court need not wait until the child is irreversibly harmed such that his physical, mental, and social development is permanently impaired before terminating the parent-child relationship. *Id*.

[24] When reviewing a termination of parental rights case, we will not reweigh the evidence or judge the credibility of the witnesses. *In re H.L.*, 915 N.E.2d 145, 149 (Ind. Ct. App. 2009). Instead, we consider only the evidence and reasonable inferences that are most favorable to the judgment. *Id.* Moreover, in deference to the trial court's unique position to assess the evidence, we will set aside the court's judgment terminating a parent-child relationship only if it is clearly erroneous. *Id*. at 148-49. A judgment is clearly erroneous only if the legal conclusions made by the juvenile court are not supported by its findings of fact, or the conclusions do not support the judgment. *In re S.P.H.*, 806 N.E.2d 874, 879 (Ind. Ct. App. 2004).

[25] Where, as here, the juvenile court entered specific findings and conclusions, we apply a two-tiered standard of review. *In re B.J.*, 879 N.E.2d at 14. First, we determine whether the evidence supports the findings, and second, we determine whether the findings support the judgment. *Id*. A finding is clearly

erroneous only when the record contains no facts or inferences drawn therefrom that support it. *Id.* If the evidence and inferences support the trial court's decision, we must affirm. *A.D.S. v. Ind. Dep't of Child Servs.*, 987 N.E.2d 1150, 1156 (Ind. Ct. App. 2013), *trans. denied.*

[26] Before an involuntary termination of parental rights may occur, the State is required to allege and prove, among other things:

(B) that one (1) of the following is true:

(i) There is a reasonable probability that the conditions that resulted in the child's removal or the reasons for placement outside the home of the parents will not be remedied.

(ii) There is a reasonable probability that the continuation of the parent-child relationship poses a threat to the well-being of the child.

(iii) The child has, on two (2) separate occasions, been adjudicated a child in need of services;

(C) that termination is in the best interests of the child; and

(D) that there is a satisfactory plan for the care and treatment of the child.

Ind. Code § 31-35-2-4(b)(2). The State's burden of proof for establishing these allegations in termination cases "is one of 'clear and convincing evidence.'" *In re H.L.*, 915 N.E.2d at 149. Moreover, if the court finds that the allegations in a

petition described in section 4 of this chapter are true, the court *shall* terminate the parent-child relationship. Ind. Code § 31-35-2-8(a) (emphasis added).

[27] Mother argues that the juvenile court erred in finding that DCS met its burden of proof to support termination of her parental rights. Specifically, Mother contends that DCS failed to prove that there was a reasonable probability that the conditions that resulted in Children's removal or the reasons for placement outside of the home would not be remedied because she asserts that the conditions that resulted in Children's removal had been remedied. Mother also claims that DCS failed to prove that the parent-child relationship posed a threat to the well-being of Children because DCS had recommended in May 2016 that all services for Mother, including visitation, be reinstated. Mother further alleges that DCS failed to prove that termination was in the best interest of Children because she was participating in services and trying to complete the services so that Children could be returned to her. Finally, Mother argues that DCS failed to prove that there was a satisfactory plan for the care and treatment of Children because DCS merely stated that adoption was the permanency plan for Children and no further details about Children or their school history were presented.

### *Remediation of Conditions*

[28] In determining whether there is a reasonable probability that the conditions that led to a child's removal and continued placement outside the home would not be remedied, we engage in a two-step analysis. *K.T.K. v. Ind. Dep't of Child Servs.*, 989 N.E.2d 1225, 1231 (Ind. 2013). First, we must ascertain what

conditions led to the child's placement and retention in foster care, and, second, we determine whether there is a reasonable probability that those conditions will not be remedied. *Id.* In the second step, the trial court must judge a parent's fitness at the time of the termination proceeding, taking into consideration evidence of changed conditions and balancing a parent's recent improvements against "'habitual pattern[s] of conduct to determine whether there is a substantial probability of future neglect or deprivation.'" *E.M.*, 4 N.E.3d at 643 (quoting *K.T.K.*, 989 N.E.2d at 1231). Pursuant to this rule, "trial courts have properly considered evidence of a parent's prior criminal history, drug and alcohol abuse, history of neglect, failure to provide support, and lack of adequate housing and employment." *A.F. v. Marion Cnty. Office of Family & Children*, 762 N.E.2d 1244, 1251 (Ind. Ct. App. 2002), *trans. denied*. In addition, DCS need not provide evidence ruling out all possibilities of change; rather, it need establish only that there is a reasonable probability the parent's behavior will not change. *In re Involuntary Termination of Parent-Child Relationship of Kay L.*, 867 N.E.2d 236, 242 (Ind. Ct. App. 2007). "We entrust that delicate balance to the trial court, which has discretion to weigh a parent's prior history more heavily than efforts made only shortly before termination." *E.M.,* 4 N.E.3d at 643. When determining whether the conditions for the removal would be remedied, the trial court may consider the parent's response to the offers of help. *A.F.,* 762 N.E.2d at 1252.

[29] Here, DCS first became involved with Parents when P.S. had been brought to the hospital with injuries caused by physical abuse by Father, and an IA was

initiated to assist Parents. During the IA, the conditions in the home were often poor in that there were open alcohol bottles where Children could get to them, there were cigarette butts and ashtrays scattered on the floor, and large piles of dirty clothes and food around the house. During this time, Parents were frequently asleep during the day when DCS would visit, and Children were able to escape from the home. Children were eventually removed from the home in July 2015 after Parents admitted they had used methamphetamine and refused to submit to a drug screen. On the same date, A.S. had an injury to her head, and the home conditions were poor due to disassembled electronic equipment, cigarette butts, ashtrays, food, and full liquor bottles being scattered around.

[30] Between August and December 2015, Mother participated in services, but would sometimes refuse to submit to drug screens, only submitting "about half the time." *Tr. Vol. 2* at 111, 113. Many of the drug screens she did submit to DCS were positive for THC. After submitting to a psychological assessment, Mother attended only six individual therapy sessions and three family therapy sessions. She failed to show up or cancelled several sessions, was difficult to contact, and at one session, she retrieved what appeared to be a glass pipe out of her truck and asked if she could smoke marijuana. Although Mother made some progress "using coping skills to reduce emotional distress," she made no progress in terms of her sobriety. *Id.* at 142-43. In December 2015, the juvenile court suspended services and supervised visitation and prohibited contact between Parents and Children because Parents were making threats against the

FCM and because the service provider indicated an unwillingness to continue services in the current environment. In May 2016, services were reinstated but not visitation. Mother participated in services for approximately two weeks, and then she began failing to show for therapy and drug screens. Mother attended only one therapy session, and on June 21, 2016, Mother tested positive for amphetamine, methamphetamine, and ephedrine.

[31] DCS is not required to rule out all possibilities of change, it need only establish that there is a reasonable probability the parent's behavior will not change. *In re Kay L.,* 867 N.E.2d at 242. "A pattern of unwillingness to deal with parenting problems and to cooperate with those providing social services, in conjunction with unchanged conditions, support a finding that there exists no reasonable probability that the conditions will change." *Lang v. Starke Cnty. Office of Family & Children*, 861 N.E.2d 366, 372 (Ind. Ct. App. 2007), *trans. denied*. Also, as we have recognized, "Even assuming that [the parent] will eventually develop into a suitable parent, we must ask how much longer [the child] should have to wait to enjoy the permanency that is essential to her development and overall well-being." *Castro v. State Office of Family & Children,* 842 N.E.2d 367, 375 (Ind. Ct. App. 2006), *trans. denied.* At the time of the termination hearing, DCS had been working with Mother for two and a half years, and Mother had hardly complied with any of the services provided by DCS. She had not remedied her substance abuse issues and had only minimally participated in therapy and other services. Based on the evidence presented, we cannot say that the juvenile court clearly erred in concluding that there is a reasonable probability

that the conditions that resulted in Children's placement outside the home would not be remedied.[5]

### *Best Interests*

[32] In determining what is in the best interests of the child, a trial court is required to look at the totality of the evidence. *In re A.K.*, 924 N.E.2d 212, 224 (Ind. Ct. App. 2010) (citing *In re D.D.,* 804 N.E.2d 258, 267 (Ind. Ct. App. 2004), *trans. denied*), *trans. dismissed.* In doing so, the trial court must subordinate the interests of the parents to those of the child involved. *Id.* Termination of a parent-child relationship is proper where the child's emotional and physical development is threatened. *Id.* (citing *In re R.S.,* 774 N.E.2d 927, 930 (Ind. Ct. App. 2002), *trans. denied*). A parent's historical inability to provide a suitable, stable home environment along with the parent's current inability to do so supports a finding that termination is in the best interest of the child. *In re A.P.* 981 N.E.2d 75, 82 (Ind. Ct. App. 2012). Testimony of the service providers, in addition to evidence that the conditions resulting in removal will not be remedied, are sufficient to show by clear and convincing evidence that termination is in the child's best interests. *In re A.S.,* 17 N.E.3d 994, 1005 (Ind. Ct. App. 2014), *trans. denied.*

---

[5] We need not address Mother's challenge to the juvenile court's conclusion that there was a reasonable probability that the continuation of the parent-child relationship posed a threat to Children's well-being because Indiana Code section 31-35-2-4(b)(2)(B) is written such that, to properly effectuate the termination of parental rights, the juvenile court need only find that one of the three requirements of subsection (b)(2)(B) has been established by clear and convincing evidence. *A.D.S. v. Ind. Dep't Child Servs.*, 987 N.E.2d 1150, 1156 (Ind. Ct. App. 2013), *trans. denied*.

[33] Mother argues that DCS did not prove that termination was in the best interests of Children because she was participating in services. However, the evidence presented established that although Mother had periods of time where she was complying with the services provided by DCS, this compliance did not last long and very little progress was made. Mother's participation in services was limited to August through December 2015 and two weeks in May 2016. She often refused to submit to drug screens, and when she did they were often positive, she failed to attend and cancelled numerous therapy appointments, and stopped participating in services altogether in May 2016. During the case, Mother continued to test positive for illegal substances, was incarcerated for periods of time, and was unable to provide Children with a suitable home free of drugs.

[34] A trial court need not wait until a child is irreversibly harmed such that his or her physical, mental, and social development is permanently impaired before terminating the parent-child relationship. *In re A.K.*, 924 N.E.2d at 224. Additionally, a child's need for permanency is an important consideration in determining the best interests of a child. *Id.* (citing *McBride v. Monroe Cnty. Office of Family & Children,* 798 N.E.2d 185, 203 (Ind. Ct. App. 2003)). At the time of the termination hearing, Children had been removed from Mother's care for over two years, and Mother had failed to make the changes in her life necessary to provide Children with a safe and healthy environment. Based upon the totality of the evidence, we conclude that the evidence supported the juvenile

court's determination that termination of Mother's parental rights was in Children's best interests.

### *Satisfactory Plan*

[35] Mother asserts that DCS did not prove that there was a satisfactory plan for the care and treatment of Children because no detail was provided about Children and their school history. We have held that for a plan to be "satisfactory," for purposes of the statute, it need not be detailed, so long as it offers a general sense of the direction in which the child will be going after the parent-child relationship is terminated. *In re A.S.,* 17 N.E.3d at 1007. A DCS plan is satisfactory if the plan is to attempt to find suitable parents to adopt the child or children. *Id.* In other words, there need not be a guarantee that a suitable adoption will take place, only that DCS will attempt to find a suitable adoptive parent. *Id.*

[36] Here, FCM Greene testified that DCS's plan for the care and treatment of Children was adoption by the foster parents that Children had been placed with since May 2016. *Tr. Vol. 2* at 123-24. Adoption by the foster parents is a satisfactory plan, and DCS did not have to provide a more detailed plan. The juvenile court did not err in determining that DCS had a satisfactory plan for Children's care and treatment.

[37] Again, decisions to terminate parental rights "are among the most difficult our trial courts are called upon to make" and are very fact sensitive. *In re E.M.*, 4 N.E.3d at 640. We will reverse a termination of parental rights only upon a

showing of "clear error" – that which leaves us with a definite and firm conviction that a mistake has been made. *In re A.N.J.*, 690 N.E.2d 716, 722 (Ind. Ct. App. 1997). Based on the record before us, we cannot say that the juvenile court's termination of Mother's parental rights to Children was clearly erroneous. We, therefore, affirm the juvenile court's judgment.

[38] Affirmed.

[39] Baker, J., and Bradford, J., concur.